Wanamaker, J.,
concurring. Upon the first hearing of this case four members of this court, Judges Johnson, Hough, Robinson and Jones, held for reversal of the judgment below. Two of the members, Chief Justice Marshall and myself, held for affirmance. Judge Matthias did not participate.
A rehearing was granted, and upon that second hearing the vote stands: for a reversal, Judges Hough, Robinson and Jones; for affirmance, Chief Justice Marshall, Judge Johnson and myself; not participating, Judge Matthias.
This equal division of the court makes impossible any declaration of law that will be recognized as the law of this case or any future similar cases.
The diligence and research of counsel, no less than ihe interest of the major question that has caused the division amongst us, are such that some statement of the case, the question of law, and the holdings of courts thereon, should be made, to at least point the way toward a further study of these questions in our criminal courts.
A very brief history of the case below is pertinent here, before entering upon a discussion of the principles of law involved.
At the January term of the court of common pleas of Van Wert county, the jury found Stewart guilty of assault with mtent to kill one Ross Connor in May, 1919. Motion for new trial was overruled, and judgment was entered upon the verdict. Error was prosecuted to the court of appeals, which affirmed the verdict and judgment of guilty.
From the affirmance of the court of appeals error is now prosecuted to this court on a great variety and large number of alleged errors occurring in the trial court. Plaintiff in error’s brief contains *627 eighteen numbered paragraphs specifying errors, seventeen of which are entirely ignored by a majority of the six judges participating in this case. The remaining error, numbered eleven, deals with the language of the charge of the court touching “man of ordinary firmness,” in connection with the right and law of self-defense. This is the only error of any merit as a ground for reversal and the granting of new trial. This language, containing the alleged error, occurs in the following paragraph of the court’s charge:
“It is not enough that.the party killing honestly believed that he was in such imminent danger, but the facts and circumstances must have been such as to afford him a reasonable ground for such belief. Of this the jury must judge from the circumstances and facts as shown by the evidence. If the conditions and appearances are such as would alarm a man of ordinary firmness, and would impress him that such danger is imminent, and if the assailed party honestly believes himself or a member or members of his family to be in such situation, it is not material whether the danger was real or only imminent.”
I hold that this language of the trial court is not only not error, but that the doctrine has been repeatedly announced and approved by the supreme courts of a large number of our states, the sole exception appearing to be an old doctrine announced in 1830 in a Tennessee case.
In addition thereto I hold likewise that the two cases cited from Ohio do not sustain this judgment; but are entirely to the contrary.
Even if it be conceded to be an incorrect statement of the law, and therefore error, I hold then *628 that it is not such an error as would justify the reversal of the judgment below, and the granting of a new trial as provided in Section 13745, General Code, and adjudication thereunder; that even then it could be at most but a trifling, technical, harmless error, neither misleading nor calculated to mislead the jury in their consideration of the defendant’s claim of self-defense.
Lastly, I hold that the record in this case, particularly the testimony of the defendant himself, is in wo wise sufficient in fact or law, as declared in numerous cases in this court, particularly the Marts case, 26 Ohio St., 162, cited in the briefs, to entitle the defendant, in any view of the case as it appeared to him, to use the force and violence against the deceased, Boss Connor, which the jury and two courts found he did use, that is to say, an assault with intent to kill.
I shall now proceed to demonstrate the truth and the soundness of these several propositions.
The court correctly charged the law on self-defense.
It must be conceded that there is no reported case in Ohio by the supreme court dealing directly with the language appearing in the charge, to-wit, “man of ordinary firmness,” or words of like import, save the Napier case (90 Ohio St., 276), later referred to. This same question, in like cases, has been frequently adjudicated in other courts of last resort, a few of which are here cited:
In 66 Iowa, 318, State v. Crawford, it is held in the third paragraph of the syllabus:
“Instructions to the effect that one may do violence to the person of another, or even take the life *629 of another, when it is absolutely necessary, or reasonably seems to be absolutely necessary to do so, for the preservation of his own life, or the protection of his own person; and that defendant was excus-, able if he acted as an ordinarily cautious and courageous man would have done under the .same circumstances, held not objectionable on account of the use of the words ‘absolutely’ and ‘courageous.’ ”
In the opinion, at page 321, the following language appears in support of the above proposition of the syllabus:
“Another objection is made because the court in other parts of the instructions directed the jury that the defendant was excusable if he acted as an ordinarily cautious and courageous man would have done under the same circumstances; and, again, he was excusable if he did nothing more than a reasonably prudent and courageous man would have done under the same circumstances. It is claimed that the use of the word ‘courageous’ was erroneous because the defendant ‘was only required to act upon the quantity of heroism possessed by the average man.’ This is just what the instructions complained of required of him. They require that it should appear that the defendant acted with reasonable caution and with reasonable courage.”
These few lines from the opinion stamp the quality of sound sense upon the conclusion of the court that there was no error in the use of this language in connection with the right of self-defense.
In 25 Oregon, 241, State v. Morey, the court in its charge made use of the words “reasonable man” in connection with defendant’s right of self-defense, in the following language:
*630 “If you believe that the defendant was assaulted in such a way as to give him ground as a reasonably prudent man,” etc.
It was claimed that that was error. The Oregon court held otherwise, and in the opinion thus discussed the words reasonable man:
“By the expression, ‘actual or real danger to the defendant’s comprehension as a reasonable man,’ as used in the charge, which is the only portion objected to, the court did not, as counsel seems to claim, lay down the rule that defendant’s conduct was to be judged by the standard of an ‘ideal reasonable man,’ but only that he must have acted under a reasonable belief in.apparent danger, justified by the circumstances of the case. This is obvious from the remainder of the instruction, especially from what immediately follows, which is explanatory thereof.”
In People v. Lynch, 101 Cal., 229, another case in point, the syllabus employs this language:
“An instruction to the jury that the bare fear of the defendant that the prosecuting witness was going to inflict bodily injury upon him would not justify him in attempting to kill the prosecuting witness, if he did so attempt, but there must have been some act or acts on the part of the latter such as would induce an ordinarily prudent man to believe that he was in great and immediate danger of death or great bodily injury, is correct,” etc.
Here we have kindred words, “ordinarily prudent man.” Cases might be multiplied, but a few more from the south, where there has probably been unusual regard for the right of self-defense, *631 will be cited in support of the doctrine for which I here contend.
In 40 S. C., 383, State v. Symmes, the second paragraph of the syllabus contains this language:
“The correctness of a charge to the jury must be determined by a consideration of the charge as a whole; and when so considered in this case, the judge correctly instructed the jury as to that necessity to take life which would excuse a homicide, further instructions having been waived.”
In the opinion of the court, prepared by Justice McGowan, the following language pertinent to the case at bar appears on page 390:
“And he still further explained [to the jury], that, ‘it is not what the prisoner at the bar may have thought about it, but he is to be measured by a man of ordinary reason and firmness; that is the mode, the measure, and the standard by which his actions on this occasion are to be judged, and are to be judged of by you, and you are to answer, What would a man of ordinary reason and firmness have done on this occasion ? And if such a man would have acted as he did, why, then, a case of self defense would be made out, and it would be your duty to acquit him,’ etc. As we understand it, all this was entirely in accordance with what this court decided in the late ease of State v. Wyse, 33 S. C., 594, and the cases there cited; and the defendant has no just cause to complain of the charge, when considered as a whole.”
In 94 Ala., 4, Askew v. State, in a per curiam opinion, the following language is found on page 8: “The charge requested by the defendant was properly refused, because it bases the right to kill the *632 deceased upon Ms mere belief that unless he did so the deceased would cut Mm, without the predicate of reasonable grounds for the belief. The circumstances must be such as would create in the mind of a reasonably prudent man the belief that such necessity existed.”
The decisions from Georgia likewise sustain this proposition. In 25 Ga., 527, Golden v. State, the seventh paragraph of the syllabus reads:
“To justify taking human life, the law makes no discrimination in favor of a drunkard or a coward, or any particular individual; but the circumstances must be such as to justify the fears of a reasonable man.”
In a later Georgia case, Gallery.v. State, 92 Ga., 463, the same doctrine in substance is announced. At the close of the opinion the following appears:
“It [the fears of a reasonable man] does not mean the fears of a coward or poltroon; it means the-fears of a man reasonably courageous.”
It is unnecessary to further multiply cases from outside of Ohio, and I shall now examine the two cases cited in support of the reversal of the judgment below.
The only cases in Ohio that even approximate this language are the Marts case, 26 Ohio St., 162, and Napier v. State, 90 Ohio St., 276. There is nothing inconsistent between the doctrine of the cases cited from various states on the identical language used by the trial judge in this Stewart case and the general doctrine laid down in the Marts and Napier cases, supra. The record of facts will clearly show this, and make still more apparent the absolute absence of any prejudicial error in this case. Yes, *633 even more, will make doubly apparent that tbe defendant upon bis own testimony never made out even a prima facie case of self-defense.
In this Steivart case it appears, under tbe most favorable construction to the defendant, that be was a man of ordinary firmness, a man of ordinary courage, ordinary prudence, ordinary reason. By the testimony of tbe state’s witnesses, be bad disabled bis opponent by a kick upon bis private parts, which was evidently the cause of tbe fall in tbe scuffle. The defendant admits that in tbe scuffle Connor fell, and nowhere does defendant deny tbe kick referred to by the state’s witnesses. It was after tbe fall of Con-nor, that tbe serious injury to Connor occurred, as is shown overwhelmingly by tbe testimony, and it was in that situation that tbe assault with intent to kill, as found by the jury and tbe two courts below, was committed.
How can it be said that Stewart was not a man of ordinary firmness when it took two men and a woman with a butcher-knife, as tbe testimony for tbe state shows, which is not denied by tbe defendant, to stop bis assault upon Connor, who was then lying upon bis back on tbe ground.
Reinforcement of tbe fact that Stewart was much more than a man of ordinary firmness, as shown by the circumstances developed in bis own testimony and corroborated by tbe conduct of bis own wife and children, will appear more fully under tbe third branch of tbe case, to-wit, that be bad not properly laid tbe ground for self-defense.
Tbe record shows that tbe state’s witnesses testified in substance that the defendant, Stewart, said to tbe deceased, Connor, before tbe altercation, that *634 he “would finish him;” that Stewart had Connor down and was upon his abdomen with his knees, working them up and down, and choking him until the blood ran from his mouth and his eyes'bulged from his head, Connor meanwhile making no resistance, evidently disabled by the vicious kick, as a result of which he fell; that Connor’s father was endeavoring to get Stewart off his son; that Mrs. Stewart was crying “Orville kill him, kill him Orville;” and that Stewart did not cease his assault upon Con-nor until Connor’s wife appeared with a butcher-knife and threatened to stab him if he did not stop. Much more of the same, import appears in the state’s testimony.
No good comes from one side saying “’tis” and the other side saying “ ’tisn’t.” I therefore appeal to the record and quote all of the defendant’s own testimony pertinent to the gist of the charge in this case, so far as it applies to his claim of self-defense:
“Q. Now, at that time, if you know, where was Ross? A. Right at the time he was watering his horse at the water tank.
“Q. Now, what occurred after you got up there by the buggy? A. I asked Mr. Connor what was the trouble. He said he wanted us to get out of there, he wasn’t going to cause any trouble; he says he didn’t want us in front. I told him we wasn’t causing any trouble. Just at that Ross spoke up, he said he was going to have me arrested. I says, ‘What am I doing to you, Ross.’ He says, ‘I will show you what you are doing.’ He tied his horse to the west end of the big gate, come to the opening, he pulled off his red sweater, overshirt, and opened the gate and come right out; started out after me.
*635 “Q. How did he come? A. He come with his fists right out, ready for business.
‘ ‘ Q. What did he do ? A. He struck me; throwed back his hand—
“Q. Where? A. For his hip pocket.
“Q. And what did you do? A. Well, I kind of grabbed for him at that time, didn’t know what he was reaching for.
“Q. Have some scuffle? A. We had a little scuffle; we tumbled in the scuffle, and he fell. I held him there a little bit on the ground.
“Q. Where was his father at that time ? A. His father was right at the spot; the minute we started for the ground he was right on top of my back, hold of my face, one hand on my nose and one hand on the back of my neck.
“Q. You may state whether at any time while' you had that engagement with Connor you made any statements? A. No, sir.
“Q. Or threats of any kind? A. No sir, I made no statements.
‘ ‘ Q. After you got up, what was said ? A. I says ‘Boss now’ — his mother was there. I says to his mother, I says, ‘If you want to settle this trouble,’ I says, ‘I am not to blame,’ I says, ‘We will call it square.’ He says, ‘I will show you.’ He started after me with his fists, and the old Connor was right with him, right behind him, and his wife was right behind him, followed me down the road.
“Q. How far did they follow you? A. I should judge 100 feet.
“Q. Any further trouble had? A. Boss was trying to hit me.
*636 “Q. There were no blows struck? A. No more; I didn’t see any more.
“ Q. You may state what you thought at the time he threw his hand behind him? A. I didn’t know what was his intention, whether he had something back there; I supposed he did any way.
“Q. Was you in fear of your family? A. Why it looked like there might have been trouble. (Objected to by Mr. Dailey on behalf of the state.)
“Q. State what you thought, if anything, he might do to your family? A. Well, he might do them harm, I didn’t know.”
Now, let us return to the Marts case, which was made the basis for the former decision reversing this Stewart case. What does the Marts case say of the elements necessary on the part of the defendant to justify the force he uses in self-defense. Let us remember, however, that under the finding of the jury the force used in this instance was sufficient to constitute “assault with intent to kill.”
Under the doctrine of the Marts case, it is necessary, before the slayer or assailant is entitled to an acquittal, that he must (a) bona fide believe; (b) have reasonable ground to believe; (c) that he is in imminent danger of death or great bodily harm; (d) that his only means of escape from such danger will be by taking the life of his assailant, or in using the force that he actually did use in this case, assault with intent to kill.
Now, where is this bona fide belief on the part of the defendant? Note his testimony:
“A. Well, I kind of grabbed him at that time; didn’t know what he was reaching for.
*637 “Q. You may state what you thought at the time he threw his hand behind him. A. I didn’t know what was his intention, whether he had something back there. I supposed he did anyway.
“Q. Was you in fear for your family? A. Why, it looked like there might have been trouble.
“Qu State what you thought, if anything, he might do to your family? A. Well, he might do them harm; I don’t know.”
Would anybody, lawyer or layman, seriously contend that this language showed any bona fide belief upon the part of the defendant that he was in imminent danger of death or great bodily harm? Tested either by science or mental philosophy, or the everyday knowledge and common experience of the average man, would anybody say that the language, “didn’t know what he was reaching for,” “didn’t know what was his intention,” “I don’t know” (referring to harm to the family), is the equivalent of bona fide belief?
It is not belief at all. It is the absence, the negation of belief. You might as well say an agnostic believes as to a religion.
Is it possible that human life has become so cheap that it may be taken, or seriously injured, by a party who says “he didn’t know,” “he didn’t know,” “he didn’t know,” “there might have-been trouble.”
The assault complained of, as shown by the record and as actually found by the jury, occurred there when the defendant was upon his back upon the ground. In that situation, how had the defendant “reasonable” grounds to fear that he was in danger of death or great bodily harm from this unarmed, disabled man?
*638 To state the proposition is to exhibit its absurdity. Had I been upon the trial bench, and a request for a charge of self-defense been made upon a state of the record such as shown by the defendant’s own testimony, I should have felt entirely warranted in absolutely refusing such a charge in the face of such flimsy testimony.
The record as quoted shows the evident surprise of the defendant’s own counsel touching the assault, for up until the direct question was put by counsel as to what the defendant thought, there was no evidence at all offered by the defendant touching his claimed danger, and the language quoted is all the language elicited from the defendant upon the most prying and persistent interrogation of his counsel. It is a bogus claim, unsupported by any adequate evidence as viewed by the ordinarily prudent man, the ordinarily cautious and courageous man, and should not receive any favor whatsoever by this court.
There is an old saying, “Actions speak louder than words.” It has passed into a common proverb, and is peculiarly applicable to this case. I refer to the conduct of the wife and the children during this alleged assault by Connor upon Stewart, as claimed by the latter, whereby Stewart was in danger of death or great bodily harm, sufficient to justify the use of the force he did use, as found by the jury.
The wife, according to her own testimony, said nothing, did nothing but stand by the horse, and it is not shown anywhere in the testimony that the conduct of the horse in any wise required her presence there. It does show unmistakably, however, ' that aid to the husband by the wife was quite unnec *639 essary, else she would have furnished such aid to her husband as Mrs. Connor furnished to her husband. Not an outcry from the children in the buggy; not an outcry from the wife tending to show that the husband was in any danger! Why, even a dog, when his master is attacked and is in danger of . his life or great bodily harm, will bark or whine, and give the master such aid as he can. No, the claim of any attack by Connor upon Stewart, which required Stewart in his own defense to use the force he did use, is merely an invention, a subterfuge, without any basis in fact, as unquestionably shown by this record.
Upon the whole record.it is therefore clearly and convincingly shown that no just basis was laid for interposing the claim of self-defense as a bona fide, justifiable claim. The defendant, according to his own testimony, never bona fide believed himself to be in danger of death or great bodily harm, such as is necessary to invoke the right of self-defense by the use of the violence that the testimony shows that he did use.
The judgment below by reason of the tie vote is affirmed.